United States v. Byrd. Good morning, Your Honors. My name is John Einhorn from New Haven. I represented Mr. Byrd at trial and obviously represent him on this appeal. I'll be brief because I think my brief sets forth the argument. The facts are very simple. We negotiated a plea agreement of 46 to 57 months, and when he arrived at sentencing, he was looking at, based upon the PSR, double that, 92 to 115 months. At sentencing, both the defendant and the government, we both urged the court, asked the court to adopt the agreement that we had agreed to. He wouldn't do that and gave him 72 months. There was additional information including a previously unidentified conviction, which your client certainly had knowledge of, even if the government didn't. That's right. There were two issues. One was, yes, the... It hardly comes as a surprise to your client that he had a conviction that the government didn't know about. One of the interesting things... And one of the interesting things about defendants in criminal cases is, and you always tell them this, of course, that we can't tell them exactly what they're looking at, but they have some idea about the range. So, yes, Your Honor, he knew it was going to be in some... in the general range that we negotiated, probably the top of the range. But the other issue that... If I may ask, what do you consider to be the error by Judge Shea at sentencing? Was it something wrong with the process of sentencing or do you just think it was substantively unreasonable in light of the party's agreement? Truthfully, it's hard to say either. I mean that the... I stand here today really talking more about the Fernandez issue. My concern is that, I think it's all of our concerns, that while the negotiating certainly shouldn't be sacrosanct, that's what makes the system run. It's important. Would your client not have been permitted to withdraw his guilty plea at the point of realizing that the parties had so badly miscalculated the guidelines? That's correct. He wouldn't have been able to withdraw. He would not have? He wouldn't, no. He would not have. The plea agreement that he executed, and he was informed of this by the judge in accepting his plea, that if you're not satisfied, if you're not happy, you can't withdraw your plea. So... Sir, let me ask a question differently. Excuse me. When it was determined or when the parties thought that there might be an error with at least one of the enhancements, but given that, could not your client have argued that the plea was not knowing and voluntary because the guidelines range was so very different from what the parties had stipulated to? It may not have been a successful argument, but could at least not have been made? I think you could make that argument, but probably not successfully, as Your Honor said, particularly based upon the language of the plea agreements, which is pretty strong. My suggestion, though, in keeping with Your Honor's query in that regard, is that a defendant receive advance notice. And so, at some point, the trial judge would say, you know what? Under Fernandez, I know you're looking for a downward departure to give effect to your negotiating. I'm likely not going to do this. I can understand that argument in another context where the premise of the plea agreement was not so dramatically wrong. I mean, here we went from a criminal history of three with an explicit reservation by the government with regard to that, saying this was just an initial estimate, and your client was in possession of the information that would suggest that he was lose all of its force with regard to a Fernandez kind of sentencing because of that serious error, and that's what Judge Shea referred to. Well, there's a second issue, too, though. In addition to the criminal history issue, there was also a two-point... Yeah, but wasn't the criminal history issue really the determinative one that changed the guidelines range so dramatically? It was the dramatic issue, that's right, but there was also an offense-level issue of two extra points. We had specifically negotiated that... We knew that there was an issue in state court about a pedestrian having been hurt by virtue of his leaving the scene, and it was negotiated. Part of the plea agreement was that wasn't included, and when Judge Shea asked the government about that, the government responded, well, we think that the state court will take care of that issue, but nonetheless... Yeah, that was subsidiary to the main issue, which was the criminal history going from three to a six, and all of those rights with regard to the amendment were reserved in the agreement, so I don't really understand. I mean, what you seem to be arguing is that the judge was bound, in effect, despite all the disclaimers, too. I can't say that. No, I can't say he's bound to do it. I just think, obviously, as the government points out in its memorandum, and I don't disagree, my client was canvassed on that point. He was canvassed to understand that the judge could, in fact... Was not bound by the plea agreement and could do something different, and in fact, that's what happened, but because of the radical difference in this particular case, it just seems to me that a better rule in following along on, maybe expanding Fernandez, would be to have the trial judge say, you know what? I'm going to do something different, and I'm going to give you a chance to withdraw your guilty plea, which otherwise, he probably wouldn't successfully have. Let me ask you another question. In your brief, you said that the lesser criminal history was part of the plea negotiations. Yes. What did you mean by that? Yes. Any plea agreement in, I only know Connecticut, but any plea agreement is negotiated. It's a give and take between the U.S. Attorney's Office and the Defense Council. That's what negotiate the facts, right? I mean, there was apparently an erroneous rap sheet here that caused the government to agree tentatively to a criminal history of three, rather than the six that it turned out to be. Okay. Are you saying that you negotiated with the government that will overlook certain prior convictions? No, the government not intentionally. I'm not saying that. I'm saying that the same rap sheet the government was privy to, I was also privy to the same rap sheet. So, in good faith, we believe that was the case. I suppose we can go back to contract law and talk about mutual misunderstandings and so forth. That's the question. Who's we? You and the government believe that. Yes. Your client had reason to believe otherwise. The client presumably knows his criminal experience. Certainly, but I think the client was also relying upon counsel and on the fact that, well, this is what was negotiated on my behalf. Who am I to stand up and say, whoa? The actual, I mean, you're talking about the shock of an agreement that would contemplate 46 to 57 turning into a recommendation of 92 to 115, but actually the sentence was 72 months. It was. It was 72. It looks like Judge Shea made certain allowances for the very situation that you're talking about. And part of his allowances were the one-to-one crack-to-powder ratio that he customarily does and did in this particular case. That was one of the allowances. Yes, Your Honor. Okay. Thank you. Thank you. Good morning. May it please the Court. Mike Gustafson, the U.S. Attorney's Office for the United States. I think Judge Shea did a great job in this sentencing, weighing all the factors, the aggravating factors and the mitigating factors, and using his discretion to come to a sentence that at the end of the day was fair, just, and reasonable. It was certainly higher than the one that on behalf of the United States, I agreed to in the plea agreement. But as Your Honors have aptly put your finger on it, and as did Judge Shea, the criminal history was skewed significantly below where it ended up being. There's no dispute. That's because it's been suggested because of an Uh-huh. And is that, and is that why, I mean, it looked to me like in the plea agreement there was a very specific hedging about the criminal history, suggesting that this was initial determination. Was there some question at the time the plea was sent to you? No. No, Your Honor. That language in the plea agreement is a boiler player standard, a part of the all agreements entered into in the District of Connecticut. Sometimes it's, I've never seen it, I've never personally been involved where I had a three and it turned out to be a six, but there are instances when maybe a four versus a three or three versus a two. On the margins it sometimes plays out that way. So that's why we include that language in our plea agreements. But in this instance, Judge Shea was aware that he had the discretion to follow Fernandez or the, we call it a Fernandez departure in Connecticut, had the option to do that. He had the discretion to do that. And he said, it's the first time I'm not going to do it in light of the factors he was looking at, including Mr. Bird's criminal history, his prior sentences, his risk to the public, the need to protect the public, the seriousness of this offense. So the court came to a number that ultimately I think is fair, just, and reasonable. He had the one-to-one ratio, which suggested a guideline range much lower than the one that the parties had stipulated to or suggested would be appropriate. He also had the advisory guideline range, which he considered. And at the end of the day, and sentencing is hard work and it's not as precise science. At the end of the day, the judge weighing all the factors and being very transparent, took the time to explain to Mr. Bird that he understood the power of plea agreements and the expectations that that might have some force in an ultimate disposition. But explained why he thought that that range that the parties agreed wasn't going to answer the mail for him. And he imposed a 72-month sentence. And there has been no error, procedural or substantive, that has been identified. So I respectfully submit that the court should affirm the judgment. If you have any questions, I can answer them now. Otherwise, I'll rely on the brief. Thank you. Thank you. There's no rebuttal. We will reserve a decision. And at this time, we'll hear